# United States Court of Appeals for the Federal Circuit

---

**ELAINE D. KAPLAN, Acting Director, Office of Personnel Management,**
*Petitioner,*

v.

**RHONDA K. CONYERS AND DEVON HAUGHTON NORTHOVER,**
*Respondents,*

AND

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent.*

---

2011-3207

---

Petition for review of the Merit Systems Protection Board in Nos. CH0752090925-R-1 and AT0752100184-R-1.

---

Decided: August 20, 2013

---

ABBY C. WRIGHT, Attorney, Appellate Staff, Commercial Litigation Branch, United States Department of Justice, of Washington, DC, argued for petitioner on rehearing en banc. With her on the brief were STEWART F. DELERY, Acting Assistant Attorney General, BETH S. BRINKMANN, Deputy Assistant Attorney General, JEANNE

E. DAVIDSON, Director, TODD M. HUGHES, Deputy Director, DOUGLAS N. LETTER and MARLEIGH D. DOVER, Attorneys.  Of counsel on the brief were SHARON M. MCGOWAN, Acting General Counsel, KATHIE ANN WHIPPLE, Deputy General Counsel, STEVEN E. ABOW, Assistant General Counsel, and ROBERT J. GIROUARD, Senior Counsel, Office of the General Counsel, Office of Personnel Management, of Washington, DC.  Of counsel was ALLISON KIDD-MILLER, Senior Trial Counsel, United States Department of Justice, of Washington, DC.

ANDRES M. GRAJALES, American Federation of Government Employees, of Washington, DC, argued for respondents Rhonda K. Conyers, et al. on rehearing en banc.  With him on the brief were DAVID A. BORER, General Counsel, and JOSEPH F. HENDERSON, Deputy General Counsel.

JEFFREY A. GAUGER, Attorney, Office of the General Counsel, Merit Systems Protection Board, of Washington, DC, argued for respondent Merit Systems Protection Board on rehearing en banc.  With him on the brief were BRYAN G. POLISUK, General Counsel, and KEISHA DAWN BELL, Deputy General Counsel.

THOMAS DEVINE, Legal Director, Government Accountability Project, of Washington, DC, for amicus curiae Government Accountability Project on rehearing en banc.

ELISABETH R. BROWN, Attorney, United States Office of Special Counsel, of Washington, DC, for amicus curiae The United States Office of Special Counsel on rehearing en banc.

ARTHUR B. SPITZER, American Civil Liberties Union of the Nation's Capital, of Washington, DC, for amici curiae National Treasury Employee Union, et al. on rehearing en banc.  With him on the brief were GREGORY O'DUDEN,

General Counsel, LARRY J. ADKINS, Deputy General Counsel, JULIE M. WILSON, Associate General Counsel, and PARAS N. SHAH, Assistant Counsel, National Treasury Employees Union, of Washington, DC.

————————————

Before RADER, *Chief Judge,* NEWMAN, LOURIE, DYK, PROST, MOORE, O'MALLEY, REYNA, WALLACH, and TARANTO, *Circuit Judges.* [1]

Opinion for the court filed by *Circuit Judge* WALLACH, in which RADER, *Chief Judge*, LOURIE, PROST, MOORE, O'MALLEY, and TARANTO, *Circuit Judges*, join.

Dissenting opinion filed by *Circuit Judge* DYK, in which NEWMAN and REYNA, *Circuit Judges*, join.

WALLACH, *Circuit Judge.*

In this federal employment case implicating national security, the Director of the Office of Personnel Management[2] ("OPM") seeks review of the decision by the Merit Systems Protection Board ("Board") holding that the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), limits Board review only to actions involving security clearance determinations, *i.e.*, determinations concerning eligibility of access to classified information. *Egan*, however, is not so limited. *Egan*'s principles prohibit Board review of the Department of Defense's ("DoD" or the "Agency") determinations concerning eligibility of an employee to occupy a "sensi-

————————————

[1]    Circuit Judge Chen did not participate in this decision.

[2]    Elaine D. Kaplan took office as the Director of the Office of Personnel Management during the pendency of this case, replacing John Berry. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Director Kaplan is automatically substituted as Petitioner in this case.

tive" position, regardless of whether the position requires access to classified information.[3]  As to the Respondents, we hold that Rhonda K. Conyers ("Conyers") no longer maintains a cognizable interest in the outcome of this case.  Ms. Conyers is therefore dismissed from this appeal.  With respect to Devon Haughton Northover ("Northover"), we reverse and remand for further proceedings.

## I.  BACKGROUND

Ms. Conyers and Mr. Northover[4] were indefinitely suspended and demoted, respectively, from their positions with the Agency after they were found ineligible to occupy "noncritical sensitive" positions.[5]  Ms. Conyers and Mr.

---

[3]    Ms. Conyers and Mr. Northover are DoD employees.  DoD regulations define "sensitive" positions as those that may have an effect on national security. *See* 32 C.F.R. § 154.13.  We do not have before us the regulations of other agencies.  Accordingly, we do not consider non-DoD "sensitive" positions.

[4]    The Board, Ms. Conyers, and Mr. Northover were all Respondents in this case.  This court will refer to the Board as the "Board," Mr. Northover as "Northover," and Ms. Conyers as "Conyers," where discussion is appropriate given her dismissal.

[5]    Departments and agencies of the Government classify jobs in three categories: "critical sensitive," "noncritical sensitive," and "nonsensitive." *Egan*, 484 U.S. at 528.  The underlying cases involve "noncritical sensitive" positions, which are defined as: "*Positions with potential to cause damage to . . . national security,* up to and including damage at the significant or serious level.  These positions include: (1) Access to Secret, "L," Confidential classified information[;] (2) *Any other positions with potential to cause harm to national security to a moderate degree . . . .*" J.A. 326 (emphases added).

Northover independently appealed the Agency's actions to the Board. In both appeals, the Agency argued that, because these positions were designated "noncritical sensitive," the Board could not review the merits of the Agency's eligibility determinations under *Egan*'s precedent.

## A. The *Egan* Holding

In *Egan*, the Supreme Court held that the Board plays a limited role in adverse action cases involving national security concerns. The respondent in *Egan* lost his laborer's job at a naval facility when he was denied a required security clearance. 484 U.S. at 520. Reversing our decision in *Egan v. Department of the Navy*, 802 F.2d 1563 (Fed. Cir. 1986), *rev'd*, 484 U.S. 518 (1988), the Court held that the Board does not have authority to review the substance of the security clearance determination, contrary to what is required generally in other adverse action appeals. 484 U.S. at 530–31. Rather, the Court held that the Board has authority to review only: (1) whether an Executive Branch employer determined the employee's position required a security clearance; (2) whether the clearance was denied or revoked; (3) whether the employee was provided with the procedural protections specified in 5 U.S.C. § 7513; and (4) whether transfer to a nonsensitive position was feasible. *Id.* at 530.

## B. Ms. Conyers's Initial Proceedings

Ms. Conyers occupied a competitive service position of GS–525–05 Accounting Technician at the Defense Finance and Accounting Service. *Conyers v. Dep't of Def.*, 115 M.S.P.R. 572, 574 (2010). Following an investigation, the Agency's Washington Headquarters Services ("WHS") Consolidated Adjudications Facility ("CAF") discovered information about Ms. Conyers that raised security concerns. J.A. 149–52. Effective September 11, 2009, the Agency indefinitely suspended Ms. Conyers from her position because she was denied eligibility to occupy a sensitive position by WHS/CAF. *Conyers*, 115 M.S.P.R. at

574. The Agency reasoned that Ms. Conyers's noncritical sensitive "position required her to have access to sensitive information," and because WHS/CAF denied her such access, "she did not meet a qualification requirement of her position." *Id.*

Ms. Conyers appealed her indefinite suspension to the Board. *Id.* In response, the Agency argued that *Egan* prohibited Board review of the merits of WHS/CAF's decision to deny Ms. Conyers eligibility for access "to sensitive or classified information and/or occupancy of a sensitive position." *Id.* (internal citation and quotation marks omitted). On February 17, 2010, the administrative judge issued an order certifying the case for an interlocutory appeal and staying all proceedings pending resolution by the full Board. *Id.* at 575. In her ruling, the administrative judge declined to apply *Egan* and "informed the parties that [she] would decide the case under the broader standard applied in . . . other [5 U.S.C.] Chapter 75 cases which do not involve security clearances . . . ." *Id.* (brackets in original).

## C. Mr. Northover's Initial Proceedings

Mr. Northover occupied a competitive service position of GS–1144–07 Commissary Management Specialist at the Defense Commissary Agency. *Northover v. Dep't of Def.*, 115 M.S.P.R. 451, 452 (2010). Effective December 6, 2009, the Agency reduced Mr. Northover's grade level to part-time GS–1101–04 Store Associate due to revocation/denial of his DoD eligibility to occupy a sensitive position. *Id.* at 453. In its Notice of Proposed Demotion, the Agency stated that Mr. Northover was in a position that was "designated as a sensitive position" and that WHS/CAF had denied him "eligibility for access to classified information and/or occupancy of a sensitive position." *Id.* (internal citation and quotation marks omitted).

Mr. Northover subsequently appealed the Agency's decision to the Board. *Id.* In response, the Agency argued it had designated the Commissary Management Special-

ist position a "moderate risk" national security position with a sensitivity level of "noncritical sensitive," and under *Egan*, the Board is barred from reviewing the merits of the Agency's "security-clearance/eligibility determination." *Id.*

On April 2, 2010, contrary to the ruling in *Conyers*, the presiding chief administrative judge ruled that *Egan* applied and that the merits of the Agency's determination were unreviewable. *Id.* The chief administrative judge subsequently certified his ruling to the full Board. *Id.* All proceedings were stayed pending resolution of the certified issue. *Id.*

### D. The Full Board's Interlocutory Review of *Conyers* and *Northover*

On December 22, 2010, the full Board affirmed the administrative judge's decision in *Conyers* and reversed the chief administrative judge's decision in *Northover*, concluding that *Egan* did not apply in cases where security clearance determinations are not at issue. *Conyers*, 115 M.S.P.R. at 590; *Northover*, 115 M.S.P.R. at 467–68. The Board held that *Egan* limits the Board's review of an otherwise appealable adverse action only if that action is based upon eligibility for or a denial, revocation, or suspension of access to classified information.[6] *Conyers*, 115 M.S.P.R. at 589–90; *Northover*, 115 M.S.P.R. at 467–68. Because Ms. Conyers and Mr. Northover did not occupy positions that required access to classified information, the Board concluded that *Egan* did not preclude Board review of the underlying Agency determinations. *Conyers*, 115 M.S.P.R. at 585; *Northover*, 115 M.S.P.R. at 464.

---

[6] The Board considered "security clearance" to be synonymous with "access to classified information." *Conyers*, 115 M.S.P.R. at 580.

OPM moved for reconsideration of the Board's decisions, which the Board denied. *Berry v. Conyers*, 435 F. App'x 943, 944 (Fed. Cir. 2011) (order granting OPM's petition for review). OPM petitioned for review to this court, and the petition was granted on August 17, 2011. *Id.* at 945. On August 17, 2012, a divided panel reversed the Board, holding that *Egan* applied to this case and concluding that determinations pertaining to eligibility to occupy a "sensitive" position were unreviewable. *Berry v. Conyers*, 692 F.3d. 1223 (Fed. Cir. 2012). We granted rehearing en banc and vacated the panel decision on January 24, 2013. *Berry v. Conyers*, 497 F. App'x 64 (Fed. Cir. 2013). Oral arguments were held on May 24, 2013.

## II. JURISDICTION

The underlying cases in *Conyers* and *Northover* were respectively dismissed by the Board as moot, *Conyers v. Dep't of Def.*, No. CH–0752–09–0925–I–3, 2011 WL 6939837 (M.S.P.B. Sept. 29, 2011), and dismissed without prejudice pending the outcome of this appeal, *see* J.A. 1765–67; 1821. The parties do not dispute that the case is moot as to Ms. Conyers. Because the parties agree that Ms. Conyers has no cognizable interest in the outcome of this appeal, her case is dismissed. *Cooper v. Dep't of the Navy*, 108 F.3d 324, 326 (Fed. Cir. 1997) ("If an appealable action is canceled or rescinded by an agency, any appeal from that action becomes moot."). Conversely, the parties do not dispute that Mr. Northover maintains a cognizable interest in the outcome of this appeal, in part, because the Defense Commissary Agency's rescission of its action does not dispose of Mr. Northover's discrimination claims. *See* J.A. 1765–67; 1821. Hence, *Northover* remains in this appeal.

We have jurisdiction under 5 U.S.C. § 7703(d)(1), which provides that OPM may seek review of a final Board order or decision when it determines the Board erred in interpreting a civil service law, rule or regulation, and that the decision will have a substantial impact on the administration of the civil service. The granting of

OPM's petition for judicial review is at the discretion of this court. *Id.*

While we may grant such petitions, the decision for review must be final, since this court lacks jurisdiction to review non-final Board decisions. *See Weed v. Social Sec. Admin.*, 571 F.3d 1359, 1362–63 (Fed. Cir. 2009) (Board's remand order was not final order subject to immediate review). A motions panel and the prior merits panel held that the Board's decisions in *Conyers* and *Northover* were appealable under the collateral order doctrine as articulated in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). We agree that jurisdiction is proper to address OPM's petition for review.

*Cohen* held that final decisions by district courts, pursuant to 28 U.S.C. § 1291, encompass not only judgments that "terminate an action," but also a "small class" of collateral rulings that, although they do not end the litigation, are appropriately deemed "final." 337 U.S at 545–46. "That small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* at 546. This "practical" approach applies to administrative actions. *Mathews v. Eldridge*, 424 U.S. 319, 330–31 (1976) (allowing judicial review of administrative action on collateral issue). Although recognizing the differing policy considerations between appeals from district courts and administrative actions, *Mathews* emphasized the "core principle that statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered remains applicable." *Id.* at 331 n.11.

We find that the Board decision before this court is sufficiently conclusive to require resolution of *Egan*'s application to "sensitive" position determinations. Await-

ing a final judgment in such cases would require Executive Branch agencies to litigate the merits and to potentially disclose matters concerning national security. Hence, this matter has the requisite "substantial impact on a civil service law," § 7703(d)(1), and in turn, qualifies as one of those "small class" of collateral rulings that, although they do not end the litigation, are appropriately deemed "final," *Cohen*, 337 U.S at 545–46.

The Board asserts that under *Kloeckner v. Solis*, 133 S. Ct. 596 (2012), this court lacks jurisdiction because, in part, Mr. Northover's appeal is a "mixed" case involving a removal action in addition to a discrimination case properly before a federal district court. *Kloeckner*, however, interpreted 5 U.S.C. § 7703(b) and not § 7703(d), which is applicable here. As we reasoned in *Horner*:

> There are sound reasons for Congress to establish in sections 7701 and 7703 different standards for the Director's participation. Under section 7701, the Director's participation before the board is in addition to the respondent agency's participation. Under section 7703(d), the Director has sole authority to seek judicial review of a board decision that is unfavorable to an agency. The Director acts under section 7703 to protect the interests of the respondent agency or to protect the interests of the civil service as a whole.

*Horner v. Schuck*, 843 F.2d 1368, 1373 (Fed. Cir. 1988). Accordingly, *Northover* is subject to immediate review under § 7703(d).

### III. STATUTORY GROUNDS FOR NATIONAL SECURITY BASED REMOVAL OF GOVERNMENT EMPLOYEES

The statutes provide a two-track system for removal of employees based on national security concerns. *Egan*, 484 U.S. at 526. In particular, relevant provisions of the Civil Service Reform Act of 1978 ("CSRA"), Chapter 75 of Title 5 of the United States Code entitled, "Adverse Actions," provide two subchapters related to removals.

The first, subchapter II (§§ 7511–7514), relates to removals for "cause." Under § 7512, a reduction in grade of an employee, as here, may qualify as an "adverse action." 5 U.S.C. § 7512(3). An employee subject to an adverse action is entitled to the protections of § 7513, which include written notice of the specific reasons for the proposed action, an opportunity to respond to the charges, and the requirement that the agency's action is taken to promote the efficiency of the service. An employee removed for "cause" has the right, under § 7513(d), to appeal to the Board. On review of the action by the Board under § 7701,[7] the agency must show that its decision is supported by a preponderance of the evidence. 5 U.S.C. § 7701(c)(1)(B). The appeal here proceeded pursuant to 5 U.S.C. § 7513(d).

The second, subchapter IV (§§ 7531–7533), relates to suspensions and removals based upon national security concerns. An employee suspended under § 7532(a) is not entitled to appeal to the Board. Nonetheless, the statute provides for a summary removal process that entitles the employee to specified pre-removal procedural rights,

---

[7]   5 U.S.C. § 7701 provides, in relevant part: "An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." 5 U.S.C. § 7701(a). It is undisputed that Northover is an "employee" as defined in the applicable statutes in this case. *See* 5 U.S.C. § 7511(a)(1)(A)(i), (ii) ("[E]mployee means . . . an individual in the competitive service . . . who is not serving a probationary or trial period under an initial appointment; or . . . who has completed 1 year of current continuous service under other than a temporary appointment limited to 1 year or less.").

including a hearing by an agency authority. 5 U.S.C. § 7532(c).

## IV. *EGAN*'S APPLICATION TO THIS CASE

The Board and Northover urge this court to limit *Egan*'s application to security clearance determinations, reasoning that national security concerns articulated in that case pertain to access to classified information only. *Egan* cannot be so confined. Its principles instead require that courts refrain from second-guessing DoD national security determinations concerning eligibility of an individual to occupy a sensitive position, which may not necessarily involve access to classified information. For the following reasons, *Egan* must apply.

### A. *Egan* Addressed Broad National Security Concerns That Are Traditionally the Responsibility of the Executive Branch

*Egan*, at its core, explained that it is essential for the President and the DoD to have broad discretion in making determinations concerning national security. In particular, *Egan* noted the absence of a statutory provision in § 7512 precluding appellate review of determinations concerning national security created a presumption in favor of judicial review. 484 U.S. at 526–27. The Court, nevertheless, held that "proposition is not without limit, and it runs aground when it encounters concerns of *national security*, as in this case, where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Id.* at 527 (emphasis added). Affording such discretion to agencies, according to *Egan*, "flows primarily from [the Commander in Chief Clause] and exists quite apart from any explicit congressional grant." 484 U.S. at 527. The Court has consistently articulated that matters touching upon foreign policy and national security fall within "an area of executive action 'in which courts have long been hesitant to intrude'" absent congressional

authorization. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 819 (1992) (Stevens, J., concurring in part and concurring in the judgment)); *see also Egan*, 484 U.S. at 529 (Foreign policy is the "province and responsibility of the Executive . . . . [C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.") (citation omitted).

The deference owed to the Executive Branch in these matters stems from our constitutional principle of separation of powers among the branches of government, *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (recognizing the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"), and the long-recognized convention that the judiciary's institutional expertise is limited under these circumstances, *Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("Unlike the President and some designated Members of Congress, neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people. The law must accord the Executive substantial authority to apprehend and detain those who pose a real danger to our security."). Indeed, *Egan* applied that same reasoning in the context of this case:

> [I]t is not reasonably possible for an outside non-expert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk.

484 U.S. at 529. This rationale applies to *all* prediction of risk regarding national security. Thus, absent congres-

sional action, judicial review of national security matters is generally prohibited.[8]

The Board and Northover's focus on only one factor, eligibility of access to classified information, is misplaced. The centerpiece of the *Egan* analysis, Executive Order No. 10,450, makes no mention of "classified information."[9]

---

[8]    The Dissent argues that we should afford *Chevron* deference to the Board's interpretation of its own jurisdiction under the CSRA. Dissent 21.  Although *Chevron* would normally apply to the Board's interpretation of the CSRA, where the agency's interpretation raises serious constitutional doubts, courts are required to inquire whether there exists another permissible interpretation. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Const. Trades Council*, 485 U.S. 568, 575–76 (1988).  The principle of separation of powers dictates here and we do not read the CSRA to "assum[e] that Congress . . . casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Solid Waste Agency of N. Cook Cnty.*, 531 U.S. 159, 172–73 (2001). The President has the primary responsibility along with the necessary power to protect the national security.  The Board cannot usurp that power by asserting *Chevron*.

[9]    The Dissent contends no Presidential Order here authorizes the DoD to make judgments whether an employee is a risk to national security. Dissent 4.  Executive Order No. 10,450 directs agencies, such as the DoD, to establish programs "to insure that the employment and retention . . . of any civilian . . . employee . . . is clearly consistent with the interests of the national security." That Presidential Order applied in *Egan*.  It applies here. The Dissent nevertheless claims support in *Cole v. Young*, 351 U.S. 536 (1956), but the Dissent's reliance on *Cole* is erroneous.  The question in *Cole* was whether the Civil Service Commission could review Mr. Cole's discharge from the military.  The government conceded the review

Exec. Order No. 10,450, § 3, 3 C.F.R. 937 (1949–1953 Comp.) ("The head of any department or agency shall designate, or cause to be designated, any position within his department or agency the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security as a sensitive position."). In addition, other relevant statutes and regulations define "sensitive" position in the broadest sense by referring to "national security" generally. *See* 10 U.S.C. § 1564 ("Security clearance investigations . . . . (e) Sensitive duties. -- For the purposes of this section, it is not necessary for the performance of duties to involve classified activities or classified matters in order for the duties to be considered sensitive and critical to the national security.") (emphasis added); *see also* 5 C.F.R. § 732.102 ("(a) For purposes of this part, the term national security position includes: (1) Those positions that involve activities of the Government that are concerned with the protection of the nation from foreign aggression or espionage . . . ."). The Board and Northover also conflate "classified information" with "national security information," but *Egan* does not imply those terms have the same meaning. In fact, *Egan*'s core focus is not on "information," but rather on the Executive's discretion to act on threats—information-based or not—to national security generally. 484 U.S. at 527 (recognizing the government's "'compelling' interest in withholding national security information") (emphasis added).

---

was expressly authorized by the Veterans' Preference Act of 1944 ("VPA"), but argued express authorization in the VPA can be overridden by Executive action pursuant to Executive Order No. 10,450. Thus, the issue presented was whether the Executive could override express Congressional authority to take action. In this case, as in *Egan*, there is no such express Congressional authority.

As explained in *Egan*, government positions may require different types and levels of security protection, depending upon the sensitivity of the position sought. 484 U.S. at 528. A government appointment is expressly made subject to a background investigation that varies in scope according to the degree of adverse effect the applicant could have on national security. *Id.* (citing Exec. Order No. 10,450, § 3, 3 C.F.R. 937 (1949–1953 Comp.)). As OPM states: "An agency's national security calculus will vary widely depending upon, inter alia, the agency's mission, the particular project in question, and the degree of harm that would be caused if the project is compromised." OPM's Br. 33. As a result, an agency's determination concerning national security entails consideration of multiple factors.

For example, categorizing a sensitive position is undertaken without regard to access to classified information, but rather with regard to the effect the position may have on national security. *See* Exec. Order No. 10,450 § 3, 3 C.F.R. 937 (1949–1953 Comp.). Similarly, agencies make predictive judgments about an individual as:

> an attempt to predict his [or her] possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he [or she] might compromise sensitive information. It may be based, to be sure, upon past or present conduct, but it also may be based upon concerns completely unrelated to conduct such as having close relatives residing in a country hostile to the United States.

*Egan*, 484 U.S. at 528–29. These predictive judgments are predicated on an individual's potential to compromise national security, which may entail classified or unclassified information. Consequently, the inquiry in these Agency determinations concerning national security is not contingent upon access to "information."

Even if the focus is placed on "information," the Board and Northover fail to appreciate that the compelling interest of withholding both classified and unclassified information is not new. Courts have long recognized that sensitive but unclassified material can be vital to national security. *See, e.g., Snepp v. United States*, 444 U.S. 507, 511–12 (1980) (per curiam) ("[F]ormer intelligence agent's publication of . . . material relating to intelligence activities can be detrimental to vital national interests even if the published information is unclassified."). The Court provides us with an illustrative example:

> A foreign government can learn a great deal about the [CIA's] activities by knowing the public sources of information that interest the Agency. The inquiries pursued by the Agency can often tell our adversaries something that is of value to them. For example, disclosure of the fact that the Agency subscribes to an obscure but publicly available Eastern European technical journal could thwart the Agency's efforts to exploit its value as a source of intelligence information. Similarly, had foreign governments learned the Agency was using certain public journals and ongoing open research projects in its MKULTRA research of "brainwashing" and possible countermeasures, they might have been able to infer both the general nature of the project and the general scope that the Agency's inquiry was taking.

*CIA v. Sims*, 471 U.S. 159, 177 (1985) (internal citation omitted).

Certainly, unclassified information can have detrimental effects on national security the same way as classified information. That is acknowledged by Executive Order No. 13,526, which states, in part: "Compilations of items of information that are individually unclassified may be classified if the compiled information reveals an additional association or relationship that . . . meets the standards for classification under this or-

der . . . ." Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009); 32 C.F.R. § 2001.13(c). In addition, courts have recognized the same. *See Kiareldeen v. Ashcroft*, 273 F.3d 542, 551 n.2 (3d Cir. 2001) ("Certain information which would otherwise be unclassified when standing alone . . . may require classification when combined with or associated with other unclassified or classified information. Additionally, when presented in a context that would reveal the FBI's investigative interest in certain individuals, organizations, or countries, information which would normally be unclassified may be properly classified."); *see also Kasza v. Browner*, 133 F.3d 1159, 1168–69 (9th Cir. 1998) (recognizing the "mosaic" or "compilation theory" of classifying information based on a combination of unclassified items of information).

The Board nevertheless cites *Cole v. Young*, 351 U.S. 536 (1956), and references the Court's discussion of the legislative history of the Act of August 26, 1950[10] ("the Act") in support of its proposition that national security concerns relate strictly to access to classified information. The Board's analysis is flawed. *Cole* held that a sensitive position is one that *implicates* national security, and in defining "national security" as used in the Act, the Court concluded that the term "was intended to comprehend only those activities of the Government that are *directly concerned with the protection of the Nation from internal subversion or foreign aggression*, and not those which

---

[10] The Act of August 26, 1950, Pub. L. No. 81–733, ch. 803, 64 Stat. 476 (1950), gave heads of certain departments and agencies of the Government summary suspension and unreviewable dismissal powers over their civilian employees, when deemed necessary in the interest of the national security of the United States. *Conyers*, 115 M.S.P.R. at 583 n.17. The Act was the precursor to 5 U.S.C. § 7532. *Id.*

contribute to the strength of the Nation only through their impact on the general welfare." 351 U.S. at 544 (emphasis added).[11] Thus, even in *Cole*, sensitive positions were defined as those that involve national security generally and not necessarily those that involve classified information only.

Furthermore, "sensitive positions" that can affect national security and "access to classified information" are parallel concepts that are *not* necessarily the same. As the Court reasoned:

> Where applicable, the Act authorizes the agency head summarily to suspend an employee pending investigation and, after charges and a hearing, finally to terminate his employment, such termination not being subject to appeal. There is an obvious justification for the summary suspension power where the employee occupies a "sensitive" position in which he could cause serious damage to the national security during the delay incident to an investigation and the preparation of charges. *Likewise*, there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the

---

[11] "It follows that an employee can be dismissed 'in the interest of the national security' under the Act only if he occupies a '*sensitive' position*, and thus that a condition precedent to the exercise of the dismissal authority is a determination by the agency head that the *position occupied is one affected with the 'national security*.'" *Cole*, 351 U.S. at 551 (emphasis added). Accordingly, the Court in *Cole* remanded the case to determine whether the petitioner's position was one in which he could adversely affect national security. *Id.* at 557.

final say in deciding whether to repose his trust in an employee who has access to such information.

*Id.* at 546 (emphasis added).[12]  DoD regulations support this conclusion.

32 C.F.R. § 154.13(a) states "[c]ertain civilian positions" that "entail duties of such a sensitive nature, including access to classified information" are referred to as "sensitive positions."  Hence, the regulations define "sensitive positions" as a position that may include but that is not limited to access to classified information.  For example, DoD categorizes a position as "noncritical sensitive" position by considering *one or more* of the following criteria:

(A) Access to Secret or Confidential information.

(B) Security police/provost marshal-type duties involving the enforcement of law and security duties involving the protection and safeguarding of DoD personnel and property.

(C) Category II automated data processing positions.

(D) Duties involving education and orientation of DoD personnel.

(E) Duties involving the design, operation, or maintenance of intrusion detection systems deployed to safeguard DoD personnel and property.

(F) Any other position so designated by the head of the Component or designee.

---

[12]    By using the word, "likewise," the Court compares the two concepts, "sensitive positions" and "access to classified information."  In doing so, it makes clear that they are parallel but not identical concepts.

32 C.F.R. § 154.13(b)(ii). A position entailing any *one or more* of these instructive examples and "the misconduct, malfeasance, or nonfeasance of an incumbent in any such position" would potentially have "an unacceptably adverse impact upon national security." 32 C.F.R. § 154.13(a). The regulations contemplate the fact that a "noncritical sensitive" position requiring access to classified information is of the same substance as a "noncritical sensitive" position involving, *inter alia,* security police-type duties involving enforcement of law and protection and safeguarding of DoD personal property. Regardless of "access to classified information," these positions might be sensitive.

Accordingly, there is no meaningful difference in substance between a designation that a position is "sensitive" and a designation that a position requires "access to classified information." Rather, what matters is that both designations concern national security. As a result, *Egan* prohibits review of DoD national security determinations concerning eligibility of an individual to occupy a sensitive position, which may not necessarily involve access to classified information. Consequently, *Egan*'s pronouncements regarding national security must apply to this case absent contrary congressional action.

## B. The CSRA Does Not Grant Broad Authority to the Board in This National Security Context

Despite the undisputed role of the Executive within this realm, Northover argues applying *Egan* to these cases "may deprive either the Congress or the Judiciary of all freedom of action merely by invoking national security." Northover's Br. 23. Certainly, under the Constitution, Congress has a substantial role in both foreign affairs and national security. Subject to Constitutional constraints, Congress has the power to guide and limit the Executive's application of its powers. Neither the CSRA nor any other legislative action provides a basis for limiting the Executive's role in these cases.

As *Egan* explained:

An employee who is removed for cause under §
7513, when his required clearance is denied, is en-
titled to the several procedural protections speci-
fied in that statute. The Board then may
determine whether such cause existed, whether in
fact clearance was denied, and whether transfer to
a nonsensitive position was feasible. Nothing in
the Act, however, directs or empowers the Board
to go further.

484 U.S. at 530–31. As a result, Congress presumably
has left the President and Executive Branch agencies
broad discretion to exercise their powers in this area. *See
Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981) ("Con-
gress cannot anticipate and legislate with regard to every
possible action the President may find it necessary to take
or every possible situation in which he might act," and
"[s]uch failure of Congress . . . does not, 'especially . . . in
the areas of foreign policy and national security,' imply
'congressional disapproval' of action taken by the Execu-
tive.") (citation omitted). Accordingly, when "the Presi-
dent acts pursuant to an express or implied authorization
from Congress," his actions should be "'supported by the
strongest of presumptions and the widest latitude of
judicial interpretation, and the burden of persuasion . . .
rest[s] heavily upon any who might attack it.'" *Id.* at 668
(quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343
U.S. 579, 637 (1952) (Jackson, J., concurring)). Nothing
in the CSRA directs otherwise.

The CSRA was amended in 1990 after *United States
v. Fausto*, 484 U.S. 439 (1988). *Fausto* held the CSRA's
silence regarding appeal rights reflected congressional
intent to preclude any review under chapter 75 for non-
preference eligible members of the excepted service. *Id.* at
448. In response, Congress passed the Civil Service Due
Process Amendments ("1990 Amendments") expanding
the Board's jurisdiction to some, but not all, non-

preference eligible excepted service employees. Pub. L. No. 101–376, 104 Stat. 461 (1990).

Northover construes the 1990 Amendments as extending by implication Board review of agency determinations concerning sensitive positions. Because certain agencies relating to national security, such as the FBI, CIA, and the NSA, were expressly exempted, Northover posits that Board review must extend to all other positions not expressly excluded. However, certain employees of the General Accounting Office, the Veterans Health Sciences and Research Administration, the Postal Service, the Postal Rate Commission, and the Tennessee Valley Authority were also excluded. *See* Pub. L. No. 101–376, 104 Stat. 461 (1990). The exclusion of these varying agencies negates Northover's contention that there was a congressional directive for the Board to review security decisions affecting all employees of particular intelligence agencies. The argument that Congress crafted some exceptions for national security and not others is flawed; national security was not a categorical factor in these exclusions.

Similarly, the Board and Northover point to the creation of the National Security Personnel System ("NSPS") in 2003 to support their argument that Congress spoke on the issue before this court. This position is supported neither by statutory language nor legislative history. NSPS was established to overhaul the then-existing personnel management system and polices of the DoD. *See* National Defense Authorization Act, Pub. L. 108–136, 117 Stat. 1392 (2003). The Board and Northover's focus on the provisions relating to appellate procedures, which replaced Board review and provided that: "[t]he Secretary . . . may establish an appeals process that provides employees of the [DoD] organizational and functional units that are included in the [NSPS] fair treatment in any appeals that they bring in decision relating to their employment . . . ." *Id*. But the NSPS also provided for several other modifications to the DoD's personnel system, including a pay for performance system and modifications

to certain collective bargaining rights. *Id.*; *see Am. Federation of Gov't Emps., AFL-CIO v. Gates*, 486 F.3d 1316, 1330 (D.C. Cir. 2007).

In 2009, NSPS was repealed largely due to strong opposition from labor organizations regarding collective bargaining issues. H.R. Rep. No. 110–146 at 394 (2007) ("The committee is concerned that the implementing regulations, issued in November, 2005, exceeded congressional intent, especially with respect to limitations on employee bargaining rights."); S. Rep. No. 110–77 at 11 (2007) ("Repealing the existing authority of the [DoD] to establish a new labor relations system under the [NSPS]. This would guarantee the rights of DoD employees to union representation in NSPS."); *see also* S. Rep. No. 111–35 at 185 (2009) ("[T]he committee has received many complaints from DoD employees during the 5 years during which the D[oD] has sought to implement NSPS, to the detriment of needed human capital planning and workforce management initiatives."); Department of Defense Human Resources Management and Labor Relations Systems, 70 Fed. Reg. 66,116, 66,123 (November 1, 2005) ("Significant differences with many of the labor organizations remain . . . ."). The statute creating the NSPS, the subsequent repeal of certain regulations concerning the DoD appeals process, and the ultimate repeal of the statute creating the NSPS itself in 2009, do not prove congressional intent to preclude DoD from insulating employment decisions concerning national security from Board review.

The Board and Northover nevertheless claim support in the enactment and subsequent repeal of the NSPS. In particular, Northover contends that Congress created the NSPS to give DoD power to foreclose Board review in non-security clearance cases because it recognized that *Egan* was confined to security clearances; Congress' repeal of NSPS thereby returned to the full scope of Board review that had existed prior to the creation of the NSPS. These assertions are also speculative.

There is nothing in Congress' enactment or repeal of NSPS indicating that Congress was concerned with the application of *Egan*. Indeed, changes proposed to the appeals process in the NSPS applied to all DoD employees, and therefore, they made no particular exceptions to security clearance determinations. In addition, the Board and Northover's emphasis on the NSPS's appellate process is misplaced because the NSPS did far more than attempt to replace the Board's review of DoD employment cases, it fundamentally altered labor-management relations and pay structures. As discussed above, the NSPS faced strong opposition from labor organizations due to unpopular limitations on bargaining rights. That Congress chose to ultimately repeal the NSPS has no bearing on the issue in this case.

The Board and Northover further argue that Congress has spoken directly on the issue of removal for national security concerns by enacting § 7532. This argument has already been rejected by *Egan*. 484 U.S. at 533 ("The argument is that the availability of the § 7532 procedure is a 'compelling' factor in favor of Board review of a security-clearance denial in a case under § 7513. We are not persuaded.").

In *Egan*, the Court observed the alternative availability of § 7513 and § 7532. *Id.* at 532. Specifically, the Court acknowledged that § 7532 does not preempt § 7513 and that the two statutory provisions stand separately and provide alternative routes for administrative action. *Id.* In addition, the Court held that the two sections were not anomalous, but rather, different. *Id.* at 533. The Court also held that one section did not necessarily provide greater procedural protections than the other. *Id.* at 533–34.

The Court in *Carlucci v. Doe*, 488 U.S. 93 (1988), further articulated and clarified § 7532's applicability. In that case, the Court determined that the summary re-

moval mechanism(s) set out in § 7532 and 50 U.S.C. § 833[13] were discretionary mechanisms in cases involving dismissals for national security reasons. *Id.* at 100. The Court found that § 7532 was not mandatory, but permissive: "'[n]otwithstanding other statutes,' the head of an agency 'may' suspend and remove employees 'in the interests of national security.'" *Id.* at 100–01 (finding nothing in § 7532 or its legislative history indicating that the statute's procedures are the exclusive means for removals on national security grounds or that § 7532 displaces the otherwise applicable removal provisions of the agencies covered by the section). Therefore, it was held that the National Security Agency was not required to apply either § 7532 or § 833 and was entitled to act

---

[13] Section 833 was a summary removal provision in the 1964 National Security Agency Personnel Security Procedures Act, 50 U.S.C. §§ 831–35 (repealed October 1, 1996).

under its ordinary dismissal procedure if it so wished.[14] *Id.* at 99–100.

Moreover, *Carlucci* held that Congress enacted § 7532 to "supplement, not narrow, ordinary agency removal procedures." *Id.* at 102. The Court reasoned that because of its summary nature, "Congress intended § 7532 to be invoked only where there is an immediate threat of harm to the national security in the sense that the delay from invoking normal dismissal procedures could 'cause serious damage to the national security.'" *Id.* (internal quotation marks omitted) (citing *Cole v. Young*, 351 U.S. 536, 546 (1956)). Consequently, should § 7532 be mandatory as the Board and Northover effectively argue, it would become the exclusive procedure in this case and similar cases, and "no national security termination would be permissible without an initial suspension and adherence to the *Cole v. Young* standard." *Id.* Given *Carlucci*'s teaching, we are unconvinced that Congress intended any

--------

[14] The *Carlucci* Court also affirmed *Egan*'s conclusion regarding §§ 7513 and 7532:

> We thus agree with the conclusion of the Merit Systems Protection Board in a similar case that "section 7532 is not the exclusive basis for removals based upon security clearance revocations," *Egan v. Department of the Navy*, 28 M.S.P.R. 509, 521 (1985), and with the Court of Appeals for the Federal Circuit that "[t]here is nothing in the text of section 7532 or in its legislative history to suggest that its procedures were intended to preempt section 7513 procedures whenever the removal could be taken under section 7532. The language of section 7532 is permissive." *Egan v. Department of the Navy*, 802 F.2d 1563, 1568 (Fed. Cir. 1986), *rev'd*, 488 U.S. 518 (1988).

*Carlucci*, 488 U.S. at 95.

such result when it enacted § 7532. *Id.* No congressional act exists curtailing the Executive's inherent powers in these matters to make the underlying eligibility determination concerning national security. Thus applying *Egan* here, the DoD's discretion to control the selection and retention of employees whose positions present risks to national security, whether or not they involve access to "information," need not be second-guessed.

### C.   Predictive Judgments Must be Committed to Agency Discretion

National security concerns render the Board and Northover's positions untenable. It is naive to suppose that employees without direct access to already classified information cannot affect national security. The Board and Northover's narrow focus on access to classified information ignores the impact employees without security clearances, but in sensitive positions, can have.[15]

---

[15]   There are certainly numerous government positions with potential to adversely affect national security. The Board goes too far by comparing a government position at a military base commissary to one in a "Seven Eleven across the street." Oral Argument at 28:10–15, *Berry v. Conyers*, 2011–3207 (May 11, 2012), available at http://www.cafc.uscourts.gov/oral-argument-recordings/search/audio.html. Commissary employees do not merely observe "[g]rocery store stock levels" or otherwise publicly observable information. Northover's Br. 20. In fact, commissary stock levels of a particular unclassified item—sunglasses, for example, with shatterproof lenses, or rehydration backpacks—might well hint at deployment orders to a particular region for an identifiable unit. Such troop movements are inherently secret. *Cf. Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931) ("When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men

Defining the impact an individual may have on national security is the type of predictive judgment that must be made by those with necessary expertise. *See Egan*, 484 U.S. at 529 ("The attempt to define not only the individual's future actions, but those of outside and unknown influences renders the 'grant or denial of security clearances . . . an inexact science at best.'") (citation omitted). When evaluating an individual for employment, it is those with such expertise who effectively can apply the Agency's "clearly consistent with the interests of

_____

fight and that no Court could regard them as protected by any constitutional right . . . .' No one would question but that a government might prevent actual obstruction to its recruiting service or the *publication of the sailing dates of transports or the number and location of troops*.") (quoting *Schenck v. United States*, 249 U.S. 47, 52 (1919)) (emphasis added). This is not mere speculation, because, as OPM contends, numbers and locations could very well be derived by a skilled intelligence analyst from military commissary stock levels. *See* Oral Argument at 13:19–14:03, *Berry v. Conyers*, 2011–3207 (May 11, 2012), available at http://www.cafc.uscourts.gov/oral-argument-recordings/search/audio.html (Q: "Can a position be sensitive simply because it provides observability? That is, one of these examples that was given was someone working at a commissary; it seems to me that someone working at a commissary has an opportunity, without access to classified information, to observe troop levels, potential for where someone is going, from what they are buying, that sort of thing." A: "I think that is right your honor. We agree with that, and I think in *Egan*, he, Mr. Egan worked on a nuclear submarine. And so, part of it was simply from what he was observing by coming and going of a nuclear submarine. And so, sensitivity can be the place where the employee works, what are they able to observe, what could they infer from, what you say, from the purchases and shipments . . . .").

national security" standard, which otherwise would conflict with the Board's "preponderance of the evidence" standard. While in certain circumstances courts can certainly consider the merits of a decision concerning national security, *Egan* held that scenario unworkable here:

> As noted above, security clearance normally will be granted only if it is "clearly consistent with the interests of the national security." The Board, however, reviews adverse actions under a preponderance of the evidence standard. § 7701(c)(1)(B). These two standards seem inconsistent. It is difficult to see how the Board would be able to review security-clearance determinations under a preponderance of the evidence standard without departing from the "clearly consistent with the interests of the national security" test. The clearly consistent standard indicates that security-clearance determinations should err, if they must, on the side of denials. Placing the burden on the Government to support the denial by a preponderance of the evidence would inevitably shift this emphasis and involve the Board in second-guessing the agency's national security determinations.

*Id.* at 531. DoD regulations require that the determination of an employee's ineligibility to hold a sensitive position must be "consistent with the interests of national security." *See* 32 C.F.R. § 154.6(b) ("The personnel security standard that must be applied to determine whether a person is eligible for access to classified information or assignment to sensitive duties is whether, based on all available information, the person's loyalty, reliability, and trustworthiness are such that entrusting the person with classified information or assigning the person to sensitive duties is *clearly consistent with the interests of national security*.") (emphasis added); *see also* Exec. Order No. 10,450, § 3, 3 C.F.R. § 937 (1949–1953 Comp.). Thus,

such Agency determinations cannot be reviewable by the Board because it would improperly place an inconsistent burden of proof upon the government.

Further, the sources upon which intelligence is based are often open and publically available. Sometimes, intelligence is obtained from sources in a fashion the source's government would find improper. Occasionally, those means of obtention are coercive and/or subversive. For example, the intelligence community may view certain disparaging information concerning an employee as a vulnerability which can be used to blackmail or coerce information out of the individual. *See Egan,* 484 U.S. at 528 (recognizing that the government has a compelling interest in protecting truly sensitive information from those who, "under compulsion of circumstances or for other reasons . . . might compromise sensitive information"). The type of information that can be coerced may vary depending on the employee's position.

In this case, Mr. Northover was a Commissary Management Specialist for the Defense Commissary Agency. This position is not the type of position that involves mere stocking of items on shelves. It is a management position that entails carrying out a range of computer assisted ordering tasks. The work is described to include generating and utilizing a wide variety of system reports as inventory and merchandising management tools. The incumbent is responsible for training, overseeing, and monitoring the work of lower-grade employees. A Commissary Management Specialist may work *uncommon tours of duty* as required. At bottom, this position does not merely involve a "low-level" employee whose duties and exposure are inconsequential.

This area of National Security Law is largely about preventing human source intelligence gathering in a manner which does not, in an open society, unnecessarily limit the public's right to access information about its government's activities. Still, there clearly is a need for such prevention. Within the sphere of national security

limitations on government employment, our society has determined that courts should defer to the agencies' threat limiting expertise. *See Egan*, 484 U.S. at 528–30.

While threats may change with time, *Egan*'s analysis remains valid. The advent of electronic records management, computer analysis, and cyber-warfare have made potential espionage targets containing means to access matters concerning national security vastly more susceptible to harm by people without security clearances. The mechanics of planting within a computer system a means of intelligence gathering are beyond the ken of the judiciary; what matters is that there are today more sensitive areas of access than there were when *Egan* was authored. Its underlying analysis, nevertheless, is completely applicable—the President, as Commander-in-Chief, has the right and the obligation, within the law, to protect the nation against potential threats. *Id.* at 527.

The potential for arbitrary application of this right under the guise of national security is a point of contention for Northover and the Board. These concerns however do not require a different result. Specifically, Northover and the Board raise concerns of the likely preclusion of judicial review of any alleged constitutional and statutory violations (*e.g.*, whistleblower retaliation) for federal employees.[16] *Egan* rejected similar concerns of

---

[16]    Petitioners and several amici discuss the terms and purposes behind the Whistleblower Protection Act, Pub. L. No. 101–12, 103 Stat. 16 (1989) ("WPA"), at great length in their briefs. They contend that the WPA limits the Executive's discretion with respect to the termination or suspension of individuals in sensitive positions where those employment determinations are tied to retaliation for the disclosure of certain classes of information. Petitioners and amici contend that Congress exercised its own authority to protect national security when it passed the WPA because it recognized that disclosures of certain

arbitrary designations and pretextual removal of federal employees, and there is no basis for a different conclusion in this case. Indeed, these concerns can no more justify review of an eligibility determination than of a clearance determination. Former Chief Judge Markey's analysis is worth noting:

> The . . . underlying rationale is a felt necessity to "protect" civilian employees against "arbitrary" denials of security clearances. Amicus and the majority see the boogy-men of "specious, arbitrary, discriminatory" clearance denials . . . . Whence the fear of arbitrary denials? Whence the automatic refusal of even a modicum of at least initial trust in Navy officials? Whence the disregard of the process (denial response denial appeal final denial) conducted by the Navy . . . before denying a clearance? . . . . The conjecture that Navy officials might act arbitrarily is not only unwarranted, it is far too weak a reed on which to rest a determination that MSPB must decide which employees of the armed forces should be granted security clearances. Given that the responsibility is the Navy's, and given the system of high level, objective, impersonal, decisionmaking employed by the Navy in carrying out that responsibility, including the employee's chance to respond and to appeal to higher authority within the agency, I can see no reason why, under those circumstances, the Navy should not be allowed to exercise its

---

improprieties may actually advance the interests of national security. Whether Congress intended to limit the authority of the Executive in making employment decisions when passing the WPA is not before us, however. There are no whistleblower claims or defenses asserted here. We address only those issues presented by Mr. Northover's case.

> *judgment* in exercising *its* authority to grant or deny security clearances.

*Egan v. Dep't of Navy*, 802 F.2d 1563, 1576–77 (Fed. Cir. 1986) (Markey, C.J. dissenting), *rev'd*, 484 U.S. 518 (1988) (emphasis in original). Moreover, DoD maintains an internal review process of eligibility determinations, which undermines the concerns Northover and the Board raise. *See* 32 C.F.R. § 154.56; *see also Romero v. Dep't of Def.*, 658 F.3d 1372, 1374 (Fed. Cir. 2011) (articulating the general organizational framework and review process used by the DoD when making security clearance determinations). Accordingly, the merits of the Agency determination before us are not reviewable by the Board.

## V.    CONCLUSION

For the foregoing reasons, the Board cannot review the merits of DoD national security determinations concerning eligibility of an employee to occupy a sensitive position that implicates national security. There is nothing talismanic about eligibility for access to classified information. The core question is whether the Agency determination concerns eligibility of an employee to occupy a sensitive position that implicates national security. When the answer to that question is in the affirmative, *Egan* applies and the Board plays a limited role in its review of the determination. Thus, the Board's decision with respect to Mr. Northover is reversed and remanded for further proceedings consistent with this decision. Ms. Conyers's appeal is dismissed for lack of jurisdiction.

### DISMISSED IN PART, REVERSED, AND REMANDED

# United States Court of Appeals
# for the Federal Circuit

_____

**ELAINE D. KAPLAN, Acting Director, Office of
Personnel Management,**
*Petitioner,*

**v.**

**RHONDA K. CONYERS AND DEVON HAUGHTON
NORTHOVER,**
*Respondents,*

**AND**

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent.*

_____

2011-3207

_____

Petition for review of the Merit Systems Protection
Board in Nos. CH0752090925-R-1 and AT0752100184-R-
1.

_____

Decided: August 20, 2013

_____

DYK, *Circuit Judge*, with whom *Circuit Judges* NEWMAN
and REYNA join, dissenting.

The majority opinion upholds sweeping claims by the
Department of Defense ("DoD") that it may take adverse
actions against non-critical sensitive employees without

review by the Merit Systems Protection Board ("MSPB" or "Board"). The effect is to effectively deny MSPB review for hundreds of thousands of federal employees—a number that is likely to increase as more positions are designated as non-critical sensitive. In my view, the DoD has acted without authority from either the President or Congress, and contrary to the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 1101 et seq.

In essence, the majority's decision rests on the flawed premise that the DoD, acting on its own—without either Congressional or Presidential authority—has "inherent authority" to discharge employees on national security grounds. No decision of the Supreme Court or any other court supports this proposition. Whatever the policy justifications for precluding MSPB review, this is a matter for Congress (and the President), not the DoD, to determine. Ironically, the majority rests its decision on grounds of separation of powers. But the majority decision both blesses and itself engages in a violation of separation of powers principles—sustaining agency action without either Presidential or Congressional authorization, and resting its decision on its own assessment of national security requirements. I respectfully dissent.

## I

As an initial matter, the majority's decision is not mandated by, or even supported by, the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988). The majority extends *Egan* to create an implied exception to MSPB review of the merits of suitability determinations for non-critical sensitive employees—here, a commissary employee (Northover) whose job required neither a security clearance nor access to classified information.[1]

---

[1] As noted in my original panel dissent, *see Berry v. Conyers*, 692 F.3d 1223, 1238 n.1 (Fed. Cir. 2012) (Dyk, J.,

In *Egan*, the Supreme Court held that the MSPB could not review the merits of an agency decision to deny an employee a security clearance where that employee was required to access classified information as a condition of his employment. *See* 484 U.S. at 520, 529. The majority extends *Egan* to bar the MSPB from reviewing the merits of agency determinations that employees are not suitable to hold sensitive positions. In other words, the majority extends *Egan's* prohibition of MSPB merits review of the DoD's *security clearance determinations* to its *suitability determinations* (i.e., whether an employee is eligible to hold a non-critical sensitive position).

The majority's extension of *Egan* is not supported by the language of *Egan* itself. The *Egan* opinion emphasizes that it decided the "narrow question" of "whether the [MSPB] ha[d] authority by statute to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action." 484 U.S. at 520. The majority's extension of *Egan* marks a departure from our own prior reading of *Egan* and makes it unique among federal courts of appeals. We have explained that *Egan* "held that the [MSPB] has no authority to review the merits of a *security clearance determination*." *Cheney v. Dep't of Justice*, 479 F.3d 1343, 1349-50 (Fed. Cir. 2007) (emphasis added) (citing *Egan*, 484 U.S. at 529). Other circuits have similarly characterized *Egan* as limited to security clearances.[2] Indeed, the

dissenting), the case as to Conyers is moot. The en banc majority agrees. *See* Maj. Op. at 8. While the case as to Conyers is moot, that case provides important context as to the breadth of the DoD's claim of authority. I agree with the majority that we have jurisdiction over Northover's appeal.

[2]    *See, e.g.*, *Rattigan v. Holder*, 689 F.3d 764, 768 (D.C. Cir. 2012) (noting that *Egan* "covers only security clearance-related decisions"); *Zeinali v. Raytheon Co.*, 636

Fifth Circuit recently confirmed that "[n]o court has extended *Egan* beyond security clearances." *Toy v. Holder*, 714 F.3d 881, 885 (5th Cir. 2013).

While the majority appears not to dispute that the actual holding in *Egan* does not support the DoD's action here, the majority finds in the "principles" of *Egan* DoD authority to remove employees on national security grounds. *See* Maj. Op. at 3, 12. The majority concludes that there is no distinction between security clearance determinations and suitability determinations when those determinations implicate national security. In the majority's view, because Congressional legislation does not forbid the exercise of such authority, the DoD is assumed to possess inherent authority. But neither *Egan* nor any other decision of the Supreme Court, this court, or any other appeals court supports this remarkable claim of inherent authority. Rather, these decisions have rejected such claims of independent agency authority.

## A

First, in the *Egan* case, Egan did not contend that the President had failed to delegate authority to the agencies, and notably the agencies were specifically authorized by Executive Order to make "final" access determinations. There is no similar Presidential Order here. The President has not delegated any authority to the DoD to make

---

F.3d 544, 549-50 (9th Cir. 2011) (noting that the "core holding" of *Egan* is that "federal courts may not review the merits of the executive's decision to grant or deny a security clearance") ; *Duane v. U.S. Dep't of Def.*, 275 F.3d 988, 993 (10th Cir. 2002) ("*Egan* held that the Navy's substantive decision to revoke or deny a security clearance . . . was not subject to review on the merits by the [MSPB].").

"final" decisions with respect to suitability determinations.

The President has traditionally had special authority in safeguarding classified information, and has delegated that authority—which includes the authority to deny or revoke such access—to agencies employing such individuals. *Egan* recognized and relied on the President's unique authority over classified information. The *Egan* court noted that the President's "authority to classify and control access to information bearing on national security . . . exists quite apart from any explicit congressional grant." 484 U.S. at 527.

While the delegation issue was not raised in *Egan*, the Presidential authority was specifically delegated to the relevant agencies. Executive Orders, both at the time of *Egan* and later, prescribed procedures for granting and revoking access to classified information, and the agency decisions in those respects were explicitly deemed to be "final," unreviewable decisions. *See* Exec. Order No. 12,968, § 5.2(a)(6), 3 C.F.R. 391 (1995 Comp.) (appeals panel within the agency makes the "final" decision), *reprinted as amended in* 50 U.S.C. § 435; Exec. Order No. 10,865, § 3, 3 C.F.R. 398 (1959-1963 Comp.) (allowing "an authorization for access to a specific classification category" granted by an agency to be "finally denied or revoked"), *reprinted as amended in* 50 U.S.C. § 435. Thus, the President unambiguously delegated to agencies determinations as to whether an employee was entitled to access classified information. The President here has claimed no such executive authority over removal of employees on national security grounds, and there is no delegation of removal authority to agencies. The majority points to no Executive Order delegating removal authority to the DoD.

While the Office of Personnel Management ("OPM") suggests that authority can be found in Executive Order 10,450, that Executive Order confers no authority to agencies to make either final classified access or suitabil-

ity determinations. In *Egan* the Supreme Court relied on Executive Order 10,450 for only two propositions: (1) that access to classified information could be granted only after a background investigation and (2) the standard for such access was that the access was "clearly consistent with the interests of the national security." *See Egan*, 484 U.S. at 528 (citing Exec. Order No. 10,450, § 3, 3 C.F.R. 936 (1949-1953 Comp.), *reprinted as amended in* 5 U.S.C. § 7311). The *Egan* court did not rely on the Executive Order for the proposition that agencies have "final," unreviewable authority with respect to the necessary suitability determinations at issue here—a matter that was addressed in the security clearance context by Executive Order 10,865, as referenced above. Notably, a later Executive Order specifically distinguished between 10,450 and 10,865, noting that "denial and revocation procedures" were governed by Executive Order 10,865, as amended, and not by Executive Order 10,450. *See* Exec. Order No. 12,968, § 7.2(c), 3 C.F.R. 391 (1995 Comp.).

Just as Executive Order 10,450 did not render determinations regarding access to classified information unreviewable, it also does not render suitability determinations unreviewable, and unlike the situation in *Egan*, there is no other executive order that does so. In other words, Executive Order 10,450 does not delegate to agencies either the authority to terminate access to classified information (a matter addressed in another executive order) or general removal authority where the employee is not suitable for a national security position.

To the extent that Executive Order 10,450 deals with removal at all, the executive order does no more than provide for removal pursuant to a specific Congressional statute authorizing such removal on national security grounds, 5 U.S.C. § 7532, a provision not invoked here. *See* Exec. Order No. 10,450 §§ 4-6. This is confirmed by the Supreme Court's decision in *Cole v. Young*, which concluded that

> it is clear from the face of . . . Executive Order [10,450] that the President did not intend to override statutory limitations on the dismissal of employees, and *promulgated the Order solely as an implementation of the 1950 Act [i.e., § 7532].* Thus § 6 of the Order purports to authorize dismissals only 'in accordance with the said Act of August 26, 1950,' [§ 7532] and similar references are made in §§ 4, 5, and 7 . . . .

351 U.S. 536, 557 n.20 (1956) (emphasis added). At oral argument here, OPM conceded that, to the extent that Executive Order 10,450 addresses the President's removal authority over employees, it does no more than implement § 7532.[3] As the Court in *Cole* further noted:

> When the President expressly confines his action to the limits of statutory authority, the validity of the action must be determined solely by the congressional limitations which the President sought to respect, whatever might be the result were the President ever to assert his independent power against that of Congress.

351 U.S. at 557 n.20. Unsurprisingly, then, OPM conceded before the MSPB that its Part 732 regulations, which "have their genesis in Executive Order 10[,]450," did not authorize removal procedures and "are silent on the scope of an employee's rights to Board review when an agency

---

[3] The following exchange occurred:

The Court: [T]he Supreme Court in *Cole* says 10,450, insofar as it deals with the removal power, is only implementing § 7532, and it is very explicit about that.

OPM: That's correct.

Oral Argument at 5:10-5:30.

deems the employee ineligible to occupy a sensitive position." J.A. 288.

In short, Executive Order 10,450 does not authorize the DoD's actions. In contrast to the situation existing at the time of *Egan*, OPM can point to no other Executive Order that renders final agency decisions with respect to suitability. The lack of delegated authority with respect to suitability determinations, as opposed to security clearance determinations, is fatal to OPM's position. The lack of such delegated authority here makes *Egan* inapposite, and the DoD's actions without authority.

B

Second, the few national security and foreign affairs cases (other than *Egan*) on which the majority relies all involve situations in which the authority asserted was authorized by Congressional legislation or an Executive Order of the President. *See, e.g., Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) ("[T]he President was authorized to suspend pending claims *pursuant to Executive Order No. 12294*." (emphasis added)); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 325-28 (1936) (various statutes and joint resolutions passed by Congress authorized the President to prohibit certain exports from the United States).[4] None of those cases remotely sup-

_____

[4]    *See also Boumediene v. Bush*, 553 U.S. 723, 732-33 (2008) (declining to address the question of whether the President has authority hold detainees at Guantanamo Bay but holding that the statutes giving the President authority to suspend habeas corpus "operate[d] as an unconstitutional suspension of the writ"); *Lincoln v. Vigil*, 508 U.S. 182, 194 (1993) (holding that an agency decision to discontinue a program was authorized by law because the action "f[ell] within the [Indian Health] Service's statutory mandate to provide health care to Indian people"); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 588-89 (1952) (rejecting the President's asser-

ports agency action on national security grounds without Congressional or Presidential authority.

## C

Third, as a general matter, agencies only have such removal authority as is conferred by Congressional statute. We are dealing with the DoD's authority to remove employees for national security reasons—either by removing them from a position by demotion as here (in Northover's case) or by discharging them from DoD employment entirely.[5] Employees such as Northover who are appointed by members of the Executive Branch other than the President can only be removed as authorized by Congressional legislation. In *United States v. Perkins*, 116 U.S. 483, 485 (1886), the Supreme Court made this clear in holding that Executive Branch employees not appointed by the President cannot be removed without Congressional authority:

> [W]hen Congress, by law, vests the appointment of inferior officers [or civil service employees] in the heads of [agencies] *it may limit and restrict the power of removal as it deems best for the public interest.* The constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed. *The head of a[n] [agency] has no constitutional prerogative of appointment to offices independently of the legislation of Congress,*

tion of authority to seize steel mills because "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself").

[5]    In the case of Conyers, she was removed from her position by an indefinite suspension.

and by such legislation he must be governed, not only in making appointments, but in all that is incident thereto [i.e., removals].

*Id.* (emphases added). There is no claim here that the DoD's actions bypassing MSPB review were authorized by Congress.[6] *Perkins* is directly inconsistent with the DoD's claim of inherent authority to discharge employees appointed by the agency without MSPB review.

This limitation on agency authority in the removal context is a manifestation of the general principle that agencies do not have independent authority apart from Congressional statute. Agencies may not act "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706. And while the majority relies on a variety of DoD regulations to support its position, the Supreme Court has held that "[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the

---

[6]     The only statute that the majority cites that appears remotely relevant is 10 U.S.C. § 1564, which states that, "[f]or the purposes of" a statutory provision providing for expedited processing of background investigations for DoD security clearances, "it is not necessary for the performance of duties [of investigated employees] to involve classified activities or classified matters in order for the duties to be considered sensitive and critical to the national security." *See* Maj. Op. at 15. This provision was merely meant to prioritize some DoD background investigations for positions that require investigations, *see* H.R. Rep. No. 106-945, at 853 (2000) (Conf. Rep.), and does not provide any indication that Congress intended to grant authority to agencies to take adverse actions, without MSPB review, against DoD employees who do not require access to classified information.

power to make law. Rather, it is the power to adopt regulations *to carry into effect the will of Congress as expressed by the statute.*" *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976) (emphasis added) (quotation marks omitted).

## D

Fourth, the Supreme Court has held that agencies have no authority, apart from the President and Congress, to take action on grounds of national security. The leading decision is *Greene v. McElroy*, 360 U.S. 474 (1959). In that case, the petitioner was removed from his job in the private sector after his required security clearance was revoked by the Secretary of the Navy, and that revocation was affirmed by the Eastern Industrial Personnel Security Board ("EIPSB"). *Id.* at 481-83, 489-90. The court of appeals there determined "that the Executive Department alone [wa]s competent to evaluate the competing considerations which exist in determining the persons who are to be afforded security clearances," *id.* at 491, much like the majority does here. However, the Supreme Court found that the removal procedures established by the agency and the EIPSB "were established by . . . the Secretary of Defense or the Secretaries of the Army, Navy and Air Force," and that "[n]one [of the procedures] was the creature of statute or of an Executive Order issued by the President." *Id.* at 495. Accordingly, the majority reversed the administrative determination, concluding that,

> [i]n the context of security clearance cases, . . . *it must be made clear that the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use.* Such decisions cannot be assumed by acquiescence or nonaction. They must be made *explicitly* not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, but also because explicit

action, especially in areas of doubtful constitu-
tionality, requires careful and purposeful consid-
eration by those responsible for enacting and
implementing our laws. Without explicit action by
lawmakers, decisions of great constitutional im-
port and effect would be relegated by default to
administrators who, under our system of govern-
ment, are not endowed with authority to decide
them.

*Id.* at 507 (emphasis added) (internal citations omitted);
*see also Cafeteria & Restaurant Workers Union v.
McElroy*, 367 U.S. 886, 889, 893 (1961) (upholding a
commanding officer's decision to deny a cafeteria worker
access to a military installation where it was "well settled
that a Post Commander c[ould], under the authority
conferred on him by *statutes* and regulations, . . . exclude
private persons and property therefrom" (emphasis add-
ed)). Nothing in *Egan* purports to overrule *Greene* (cited
by the *Egan* dissent, *see* 484 U.S. at 536 (White, J., dis-
senting)), or suggests that agencies can exercise removal
powers without Presidential or Congressional authoriza-
tion. Rather, as noted earlier, *Egan* relies on the exist-
ence of Presidential—not agency—authority to determine
access to classified information.

## II

Quite apart from the DoD's lack of Presidential or
Congressional authority, the DoD action here is directly
contrary to the CSRA, which broadly provides for review
of adverse actions. Congress, by adopting specific national
security exemptions from MSPB review that do not apply
to Northover, has confirmed that the statutory MSPB
review procedures are applicable in other circumstances.
This determination is binding on both the DoD and the
President.

When it enacted the CSRA, Congress created a broad
statutory scheme that was designed to confer upon the
MSPB extensive review authority over adverse actions

affecting government employees. Subchapter II of Chapter 75 of the CSRA gives every "employee" the right to seek MSPB review of adverse actions, *see* 5 U.S.C. § 7513(d), and "employee" includes most government employees who have served in either the competitive or excepted service for at least one year. *See id.* § 7511(a)(1). Beyond the CSRA's broad coverage of government employees, the act also provides the MSPB with review authority over a broad array of adverse actions, including "removals," "suspension[s] for more than 14 days," "reduction[s] in grade," "reduction[s] in pay," and "furlough[s] of 30 days or less." *See id.* § 7512. Congress made clear when it passed the CSRA that "[t]hese provisions [were to] govern *any* [adverse] action where the basis of the agency action is misconduct *or any other cause* besides unacceptable performance." S. Rep. No. 95-969, at 46 (1978) (emphases added). The agency concedes that Northover received a demotion, which is among the enumerated adverse actions covered by the statute. *See* 5 U.S.C. § 7512.

Congress granted this broad authority for a reason: by providing for MSPB review, civil service employees would be "protected against arbitrary action, personal favoritism, and . . . partisan political coercion" that may occur within government agencies. S. Rep. No. 95-969, at 19 (1978). The MSPB was designed as a check on both agency and OPM actions, as "[e]stablishment of a strong and independent Board" was designed to "discourage subversions of merit principles." *Id.* at 7. In fact, Congress made clear that, "[a]bsent . . . [the] mandate for independence [of] the Merit Board, it is unlikely that [Congress] would have granted [OPM] the power it has or the latitude to delegate personnel authority to the agencies." *Id.*

Congress has been notably aware of national security issues in the context of government employment. Congress has not created a general national security exception that places limitations on MSPB review or given agencies the authority to create such an exception. In-

stead, Congress created specific exceptions to deal with national security issues, balancing the needs of national security with the right to MSPB review. None of those exceptions is applicable here, and the very existence of these numerous exceptions refutes the existence of agency authority to create others.

First, implementing the decision in *Egan*, Congress has authorized agencies to deny access to classified information and has exempted such determinations from MSPB review. Congress, in 1994, added Title VIII to the National Security Act of 1947, granting the President authority to "establish procedures to govern access to classified information." Intelligence Authorization Act for Fiscal Year 1995, Title VIII, § 802(a), 108 Stat. 3423, 3435 (1994) (codified as amended at 50 U.S.C. § 435(a)). The statute authorizes the President to establish "uniform minimum standards" of procedures for "employees in the executive branch . . . whose access to classified information is . . . denied or terminated," *see* 50 U.S.C. § 435(a)(5), and makes those standards "binding upon all departments, agencies, and offices of the executive branch of Government," *id.* § 435(a); *see also id.* § 435(a)(2) (noting that the standards govern Executive Branch employees "who require access to classified information as part of their official responsibilities"); *id.* § 435(a)(3) (same); *id.* § 435(a)(4) (referring to employees "requir[ing] access to particularly sensitive classified information").[7] Consistent with *Egan*, the goal of the statute was to provide minimal procedural protections to employees in connection with security clearance procedures. *See* H.R. Rep. No. 103-753,

---

[7]    The executive order implementing this provision was Executive Order 12,958, which governed classified national security information.  *See* Exec. Order 12,958, 3 C.F.R. 333 (1995 Comp.). That executive order has since been superseded and replaced by Executive Order 13,526, 3 C.F.R. 298 (2010 Comp.).

at 54 (1994) (Conf. Rep.). The statute conferred no authority to terminate employees in non-critical sensitive positions that did not require access to classified information. *Id.*[8]

Second, Congress, in § 7532, conferred general authority on the heads of government agencies to remove employees where the removal "is necessary or advisable in the interests of national security." 5 U.S.C. § 7532(b). While *Egan* concluded that § 7532 did not provide the sole means of ordering the review of security clearances—a view confirmed by *Carlucci v. Doe*, 488 U.S. 93 (1988)[9]—

---

[8]    Along the same lines, Congress amended Title VIII in 2004 to require the President to designate an agency (ultimately, OPM) that would "conduct . . . security clearance investigations of [government] employees . . . *who require access to classified information . . . .*" Intelligence Reform and Terrorism Prevention Act of 2004, § 3001(c)(1), 118 Stat. 3638, 3707 (emphasis added) (codified as amended at 50 U.S.C. § 435b(c)(1)).

[9]    In *Carlucci*, an employee of the National Security Agency ("NSA") was terminated after the employee disclosed to the NSA that he had engaged in homosexual relationships with foreign nationals. 488 U.S. at 97-98. Though *Carlucci* explained (and the majority emphasizes) that the summary removal procedures of 5 U.S.C. § 7532 and 50 U.S.C. § 833 did not furnish the exclusive basis for agency removals on national security grounds, it emphasized that, apart from the summary suspension authority, the NSA had a general authority to remove employees for national security reasons under 50 U.S.C. § 831. *Carlucci*, 488 U.S. at 102-03; *see also* 50 U.S.C. § 831 (permitting the Secretary of Defense to prescribe regulations "to assure . . . that no person shall be employed in, or detailed or assigned to, the *National Security Agency* . . . , or continue to be so employed . . . unless such employment . .

the Supreme Court in *Egan* had no occasion to address national security suitability determinations or the impact of this exception on the scope of the Civil Service Reform Act as to national security suitability determinations. *See* 484 U.S. at 532-34.

Third, before *Egan*, Congress granted the director of the Central Intelligence Agency ("CIA") plenary authority to "terminate the employment of any officer or employee of the [CIA] whenever he shall deem such termination necessary or advisable in the interests of the United States." National Security Act of 1947, Pub. L. No. 80-253, § 102(c), 61 Stat. 495, 498 (1947) (codified at 50 U.S.C. § 403-4a(e)(1)). In 1964, similarly, Congress exempted employees of the National Security Agency ("NSA") from MSPB review. *See* Act of Mar. 26, 1964, Pub. L. No. 88-290, § 303(a), 78 Stat. 168, 169. These exemptions covered employees of these agencies whether or not their positions required access to classified information, and were designed to enable heads of agencies to discharge employees based on national security concerns.

Fourth, after Egan, in 1990, when Congress expanded MSPB review to the excepted service, *see* Pub. L. No. 101-376, 104 Stat. 461 (1990), it provided that employees of the Federal Bureau of Investigation ("FBI") as well as the CIA and NSA were exempted from MSPB review "because of their sensitive missions." H.R. Rep. No. 101-328, at 5. In 1996, Congress expanded the exemptions from MSPB

---

. is clearly consistent with the national security" (emphasis added)).

Thus, in contrast to this case, a specific statute conferred removal authority on the NSA, and exempted the NSA from the CSRA. *See* 50 U.S.C. § 831; *see also Carlucci*, 488 U.S. at 96-97 (noting that 50 U.S.C. § 831 was part of the NSA Personnel Security Procedures Act, which adopted separate removal procedures from the CSRA).

review even further to include *all* "intelligence compo-nent[s] of the Department of Defense." 5 U.S.C. § 7511(b); *see also* Department of Defense Civilian Personnel Policy Act of 1996, Pub. L. No. 104-201, § 1634(B), 110 Stat. 2745, 2752 (1996). DoD did not seek, and Congress did not grant, such authority over employees in non-intelligence components of the DoD.

Then, also in 1996, Congress granted the Secretary of Defense the authority to "terminate . . . *any employee* in a defense intelligence position," regardless of whether the employee was part of an intelligence component, where he "determine[d] that the procedures prescribed in other provisions of law that authorize the termination of the employment of such employee [e.g., § 7513] cannot be invoked in a manner consistent with the national securi-ty." 10 U.S.C. § 1609(a)-(b) (emphasis added); *see* Depart-ment of Defense Civilian Personnel Policy Act of 1996, Pub. L. 104-201, sec. 1632(a), 110 Stat. 2745, 2748 (1996) (relevant portion codified as amended at 10 U.S.C. § 1609). These terminations are "final and may not be appealed or reviewed outside the [DoD]." 10 U.S.C. § 1609(b). Unlike § 7532, the provision "does not affect the right of the employee involved to seek or accept employ-ment with any other department or agency of the United States if that employee is declared eligible for such em-ployment by the Director of [OPM]." 10 U.S.C. § 1609(d).

Fifth, in 2003, Congress took further action to limit MSPB merits review of certain national security employ-ees under Chapter 75 of the CSRA. *See* National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1101, 117 Stat. 1392, 1621-33 (2003). The legisla-tion empowered the Director of OPM to establish a Na-tional Security Personnel System ("NSPS"). *Id.* § 1101(a) (codified at 5 U.S.C. § 9902(a) (2006)). It allowed OPM to establish appeal procedures separate from the MSPB's procedures. *See id.* (codified at 5 U.S.C. § 9902(h)(1)(A) (2006)). Though the MSPB review standards were to apply by default in the NSPS, Congress made clear that

the standards were not to apply where *"such standards and precedents [we]re inconsistent with legal standards established [by the Secretary]." Id.* (codified at 5 U.S.C. § 9902(h)(3) (2006)) (emphasis added). By creating this exception, then, Congress allowed the Secretary of Defense to bypass the independent MSPB review process—and to do so with respect to any employee, including those who did not require security clearances. And that is exactly what the Secretary did.[10] However, on January

---

[10]   After obtaining the statutory authorization described above, the Secretary of Defense promulgated regulations in 2005 that limited the MSPB's authority and independence in cases that implicated national security. *See Department of Defense Human Resources Management and Labor Relations Systems*, 70 Fed. Reg. 66,116 (Nov. 1, 2005). Though the regulations maintained MSPB review in some form, to the extent that the MSPB retained review over adverse action appeals it was bound to interpret the implementing regulations "in a way that recognize[d] the critical national security mission of the Department." *Id.* at 66,192 (codified at 5 C.F.R. § 9901.107(a)(2) (2006)); *see also id.* at 66,208 (codified at 5 C.F.R. § 9901.802 (2006)) (noting that the MSPB would be bound by the legal standard set forth in § 9901.107(a)(2)).

The regulations, moreover, expressly waived and superseded MSPB appellate procedures to the extent those procedures were inconsistent with other regulations. *Id.* at 66,208 (codified at 5 C.F.R. § 9901.803 (2006)). MSPB AJ decisions could be modified or reversed by the DoD "[w]here it [was] determined that the initial AJ decision ha[d] a direct and substantial adverse impact on the Department's national security mission." *Id.* at 66,210 (codified at 5 C.F.R. §9901.807(g)(2)(ii)(B) (2006)).   The Secretary of Defense could also designate offenses as mandatory removal offenses "in his or her *sole, exclusive, and unreviewable* discretion" where he or she determined

28, 2008, Congress eliminated the DoD's authority to create a separate appeals process and invalidated those regulations that would have restricted the MSPB's review authority. *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1106(a),(b)(3), 122 Stat. 3, 349, 356-57.[11]

The evolution of these numerous exceptions to MSPB review in the national security context confirm that Congress did not create or authorize a general national security exemption from MSPB review. This extensive Congressional action is quite inconsistent with the majority's view that the DoD has inherent authority to remove employees on national security grounds without MSPB review. If the DoD had such inherent authority there would have been no need for these detailed and specific Congressional actions. There is also not the slightest suggestion in the long series of Congressional actions that it viewed the DoD as having inherent authority to remove employees on national security grounds without MSPB review. The majority's contrary view is inconsistent with established authority holding that "'[w]here Congress

---

that the offense "has a direct and substantial adverse impact on the Department's national security mission." *Id.* at 66,190 (codified at 5 C.F.R. § 9901.103 (2006)) (emphasis added) (definition of "Mandatory removal offense").

[11] The remaining statutory provisions creating the NSPS were ultimately repealed on October 28, 2009. *See* National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 1113(b)-(c), 123 Stat. 2190, 2498 (2009) (repealing the NSPS and invalidating all regulations implementing the NSPS, noting that such regulations "shall cease to be effective as of January 1, 2012"); *see also National Security Personnel System*, 76 Fed. Reg. 81,359 (Dec. 28, 2011) (repealing regulations implementing the NSPS effective January 1, 2012).

explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'" *Hillman v. Maretta,* 569 U.S. ___, ___, 133 S. Ct. 1943, 1953 (2013) (quoting *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616-17 (1980)); *see also TRW Inc. v. Andrews,* 534 U.S. 19, 28 (2001) (same); *United States v. Brockamp,* 519 U.S. 347, 352 (1997) (noting that an "explicit listing of exceptions . . . indicate[s] to us that Congress did not intend courts to read other unmentioned . . . exceptions into the statute"). Congress's careful creation and, in one case, elimination of national security exceptions is directly inconsistent with the majority's claim that the DoD possesses inherent authority apart from the CSRA to discharge employees on national security grounds without MSPB review.

The majority makes a specious attempt to suggest that some of these numerous Congressional actions were not motivated by national security concerns. No objective reading of these Congressional actions can avoid the conclusion that national security and employment was a matter of intense Congressional concern and that Congress legislated repeatedly in this area to accommodate these national security concerns. Neither the existence of non-security related exemptions for other agencies promulgated in the 1990 amendments to the CSRA nor Congressional concern with employee bargaining rights in repealing the NSPS should indicate that these Congressional actions were not the product of a Congressional decision to strike an appropriate balance between national security concerns and the right to MSPB review, a balance that is deeply undermined by today's decision.[12]

---

[12]   With regard to the majority's suggestion that collective bargaining was the motivation for repealing the NSPS, the 2008 amendment to the collective bargaining provisions had nothing to do with the repeal of the Chap-

### III

Finally, even if the CSRA were ambiguous (which it is not), the Board (and not the DoD or OPM) is charged with administering the pertinent adverse action provisions of Chapter 75 of the CSRA. *See* 5 U.S.C. §§ 1204, 7701. The Board has concluded that it has jurisdiction over national security removals (not involving access to classified information), and *Chevron* requires that we defer to the MSPB's interpretation of its own jurisdiction. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

In *Egan*, the MSPB held that it lacked jurisdiction over "underlying security clearance determination[s]." *Egan v. Dep't of the Navy*, 28 M.S.P.R. 509, 514-15, 519-20 (1985). Here, in contrast, the Board, interpreting the pertinent sections of the CSRA, concluded that its jurisdiction to review adverse actions extended to review of the underlying suitability determination. *Conyers v. Dep't of Defense*, 115 M.S.P.R. 572, 577, 585-86 (2010); *Northover v. Dep't of Defense*, 115 M.S.P.R. 451, 456, 464 (2010). The Board reasoned that 5 U.S.C. § 1204 directs the Board to "adjudicate . . . all matters within [its] jurisdiction," and that employees subjected to adverse actions, as

---

ter 75 exemption authority or the repeal of the regulations restricting adverse action appeal rights. As the Department of Defense itself noted, the restoration of adverse action appeal rights to its employees was designed to "[b]ring[] NSPS under Governmentwide rules for disciplinary actions and employee appeals of adverse actions." *National Security Personnel System*, 73 Fed. Reg. 56,344, 56,346 (Sept. 26, 2008). The provisions of the NSPS concerning collective bargaining were contained in subsection (m) of 5 U.S.C. § 9902, whereas the provisions relating to adverse action appeal rights were contained in subsection (h), and had nothing to do with collective bargaining.

defined in §§ 7511 and 7512, are "entitled to appeal to the [Board] under section 7701." *See Conyers*, 115 M.S.P.R. at 577; *see also* 5 U.S.C. §§ 1204, 7511, 7512. The Board considered and rejected OPM's argument that it could not review the merits of national security determinations underlying adverse actions. *Conyers*, 115 M.S.P.R. at 578–86.

In *City of Arlington, Texas v. Federal Communications Commission*, which was decided after briefing in this case, the Supreme Court made clear that *Chevron* deference extends to an agency's interpretation of its own jurisdictional statutes, 569 U.S. ___, ___, 133 S. Ct. 1863, 1868 (2013), holding that "no exception exists to the normal [deferential] standard of review for jurisdictional or legal question[s] concerning the coverage of an Act." *Id.* at 1871 (quoting *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 830 n.7 (1984)) (internal quotation marks omitted). In other cases, both our court and the Supreme Court have afforded *Chevron* deference to Board interpretations of the CSRA. *See Cornelius v. Nutt*, 472 U.S. 648, 659 (1985); *Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1338 (Fed. Cir. 2006) (en banc); *Tunik v. Merit Sys. Prot. Bd.*, 407 F.3d 1326, 1336 (Fed. Cir. 2005); *see also Lovshin v. Dep't of the Navy*, 767 F.2d 826, 840 (Fed. Cir. 1985) (acknowledging that "deference is appropriately given to the MSPB's interpretation of the CSRA"). Here, the Board resolved the statutory ambiguity in a formal adjudication. *See Conyers*, 115 M.S.P.R. 572; *Northover*, 115 M.S.P.R. 451. Formal adjudications are entitled to deference. *See, e.g.*, *Fed'n of Fed. Emps., Local 1309 v. Dep't of the Interior*, 526 U.S. 86, 89-90, 98-99 (1999). Thus, deference is due to the Board's interpretation of its authority, just as deference would have been due to the MSPB's interpretation that it *lacked* merits review jurisdiction in *Egan*.

IV

Ultimately, the majority decision rests on its policy judgment that the MSPB should not review suitability

determinations based on national security. For example, the majority urges that the Board is unable to make judgments about national security issues and that the "efficiency of the service" standard implemented by the Board does not leave room for the assessment of predictive judgments as to national security. As the Board points out, while the Board cannot make judgments about security clearances, the Board is required to make judgments in a wide variety of areas as to the suitability of employees. Indeed, in several cases the MSPB has made predictive judgments as to whether an employee is suitable to hold a position, even positions that have an apparent nexus with national security and have striking similarities to the positions at issue here.[13] As with Northover, whose adverse action was taken against him on the basis of delinquent finances, the MSPB has made predictive judgments under the efficiency of the service standard on the basis of delinquent finances.[14]

---

[13] *See, e.g.*, *Adams v. Dep't of the Army*, 105 M.S.P.R. 50, 55 (2007), *aff'd*, 273 F. App'x 947 (Fed. Cir. 2008) (upholding the Army's removal of an employee deemed unsuitable to access a computer system that "provide[d] employees with access to sensitive information" that was "not classified" and did not require a security clearance); *Jacobs v. Dep't of the Army*, 62 M.S.P.R. 688, 694-95 (1994) (affirming an AJ's decision to uphold a 30-day suspension for a security officer who protected a facility containing chemical weapons).

[14] *See Adams*, 105 M.S.P.R. at 56-57; *see also James v. Dale,* 355 F.3d 1375, 1379 (Fed. Cir. 2004) ("The Board routinely evaluates such factors as loyalty, trustworthiness, and judgment in determining whether an employee's discharge will promote the efficiency of the service." (quotation marks omitted)); *Cornish v. Dep't of Commerce*, 10 M.S.P.R. 382, 383-85 (1982) (assessing an employee's bad debt and its impact on the efficiency of the service).

At the end of the day, there may be good policy reasons to cabin MSPB review of adverse actions based on national security suitability determinations. But Congress has made a judgment to restrict, rather than eliminate, MSPB review in the area of national security. If broader authority is necessary, the affected agencies must seek such authority from Congress or the President, as they have done in the past. What agencies cannot do is claim authority when that authority has not been delegated by either Congress or the President.

V

The consequences of the majority's decision will be profound. In the DoD alone, it will affect at least 200,000 non-critical sensitive civilian employees whose positions do not require access to security clearances, as OPM conceded at oral argument. Numerous employees in other agencies will be affected as well, as agencies other than DoD designate positions as non-critical sensitive. For example, agencies under the umbrellas of the Department of Homeland Security (such as the Transportation Security Administration), the Department of Energy, the Department of State, and the Justice Department designate positions as non-critical sensitive.[15] There are dozens of

---

[15] U.S. Gov't Accountability Office, GAO-12-800, *Agencies Need Clearly Defined Policy for Determining Civilian Position Requirements* 31-32 (2012); National Security Position Handbook, 440-7-H, App. A (2004), *available at* http://www.usgs.gov/usgs-manual/handbook/hb/440-7-h/440-7-h-appa.html; 3 U.S. Department of State Foreign Affairs Manual (2012), *available at* http://www.state.gov/documents/organization/84853.pdf; Department of Justice, Report No. I-97-06, *Oversight of Background Investigations by the Security and Emergency Planning Staff* (1997), *available at* http://www.justice.gov/oig/reports/OBD/e9706.htm.

pending appeals before the MSPB involving individuals who suffered an adverse action based on their purported ineligibility to hold a sensitive position that await our court's disposition in this case.[16] MSPB review of these

---

[16] These cases have generally been dismissed without prejudice and will be reopened when this en banc decision is issued. *See Anderson v. Dep't of Def.*, No. CH-0752-12-0425-I-2, 2012 MSPB LEXIS 5193 (M.S.P.B. Sept. 11, 2012) (accounting technician, removal); *Brown v. Dep't of Def.*, No. CH-0752-12-0405-I-2, 2012 MSPB LEXIS 6373 (M.S.P.B. Oct. 26, 2012) (accountant, removal); *Cobb v. Dep't of Def.*, No. CH-0752-12-0412-I-2, 2012 MSPB LEXIS 6379 (M.S.P.B Oct. 26, 2012) (accounting technician, removal); *Ebrahimi v. Dep't of the Air Force*, No. AT-0752-12-0763-I-1, 2012 MSPB LEXIS 5507 (M.S.P.B. Sept. 21, 2012) (electronics engineer, removal); *Goodwin v. Dep't of Def.*, No. CH-0752-13-0402-I-1, 2013 MSPB LEXIS 2006 (M.S.P.B. Apr. 15, 2013) (military pay technician, suspension without pay); *Grimes v. Dep't of Def.*, No. AT-0752-12-0334-I-2, 2012 MSPB LEXIS 5394 (M.S.P.B Sept. 17, 2012) (supervisory store associate, demotion); *Hall v. Dep't of Energy*, No. AT-0752-12-0134-I-1, 2012 MSPB LEXIS 107 (M.S.P.B. Jan. 10, 2012) (courier, removal); *Harris v. Dep't of Def.*, No. CH-0752-12-0479-I-2, 2012 MSPB LEXIS 5232 (M.S.P.B Sept. 11, 2012) (military pay technician, removal); *Ingram v. Dep't of Def.*, No. DC-0752-10-0264-B-1, 2012 MSPB LEXIS 4999 (M.S.P.B. Aug. 28, 2012) (supervisory commissary store associate, demotion); *Kennedy v. Dep't of Def.*, No. CH-0752-13-0499-I-1, 2013 MSPB LEXIS 2953 (M.S.P.B. June 4, 2013) (management and program analyst, removal); *Leclerc v. Dep't of Def.*, 2013 MSPB LEXIS 316 (M.S.P.B. Jan. 18, 2013) (accounting technician, suspension without pay and removal); *Lewis v. Dep't of Def.*, No. CH-0752-12-0542-I-2, 2012 MSPB LEXIS 5248 (M.S.P.B. Sept. 11, 2012) (accounting technician, removal); *Mastrogiovanni v. Dep't of Def.*, No. NY-0752-11-0130-I-2,

and many more such appeals will inevitably be foreclosed by the majority's holding, even though the majority purports to limit its holding to the DoD. These appeals will involve a wide range of positions, including accounting technician and commissary positions (like those held by Conyers and Northover), as well as secretarial, human resources, contract specialist, engineering, and other positions. *See supra* note 16. These appeals will not just

---

2012 MSPB LEXIS 5361 (M.S.P.B. Sept. 18, 2012) (accounting technician, removal); *McFarland v. Dep't of Def.*, No. CH-0752-11-0648-I-2, 2012 MSPB LEXIS 5261 (M.S.P.B. Sept. 10, 2012) (financial management analyst, removal); *McFarland v. Dep't of the Navy*, No. AT-0752-11-0431-I-1, 2011 MSPB LEXIS 6527 (M.S.P.B. Oct. 17, 2011) (medical records technician, removal); *Medley v. Dep't of Def.*, No. DC-0752-13-0167-I-1, 2013 MSPB LEXIS 831 (Feb. 13, 2013) (human resources specialist, demotion); *Morgan v. Dep't of Def.*, No. PH-0752-12-0343-I-3, 2013 MSPB LEXIS 793 (Feb. 12, 2013) (accounting technician, removal); *Quarles v. Dep't of Def.*, No. CH-0752-12-0451-I-2, 2012 MSPB LEXIS 5251 (M.S.P.B Sept. 11, 2012) (contact representative, removal); *Sawyer v. Dep't of the Air Force*, No. AT-0752-12-0249-I-1, 2012 MSPB LEXIS 5298 (M.S.P.B. Sept. 10, 2012) (contract specialist, removal); *Scott v. Dep't of Def.*, No. CH-0752-12-0579-I-2, 2012 MSPB LEXIS 6376 (M.S.P.B. Oct. 26, 2012) (secretary, removal); *Sohn v. Dep't of the Navy*, No. SH-0752-12-0639-I-1, 2012 MSPB LEXIS 6610 (M.S.P.B. Nov. 6, 2012) (electronics engineer, indefinite suspension); *Spivey v. Dep't of Def.*, No. CH-0752-13-0361-I-1, 2013 MSPB LEXIS 1846 (M.S.P.B. Apr. 4, 2013) (military pay technician, removal); *Warner v. Dep't of Def.*, No. CH-0752-13-0228-I-1, 2013 MSPB LEXIS 629 (M.S.P.B. Feb. 1, 2013) (accounting technician, removal); *Williams v. Dep't of Def.*, No. CH-0752-12-0416-I-2, 2012 MSPB LEXIS 5327 (M.S.P.B. Sept. 11, 2012) (military pay technician, removal).

apply to removals, but will also apply to suspensions, demotions, reductions in grade or pay, and numerous other adverse actions that effectively remove employees from national security positions. *See id.* Meanwhile, the number of employees affected is likely to increase, as a new rule proposed by OPM would allow agencies to designate as non-critical sensitive any "[p]ositions not requiring eligibility for access to classified information, but having the potential to cause significant or serious damage to the national security." *Designation of National Security Positions in the Competitive Service, and Related Matters*, 78 Fed. Reg. 31,847, 31,849 (May 28, 2013) (to be codified at 5 C.F.R. § 1400.201(a)(1)(ii)). If positions of grocery store clerk and accounting secretary are deemed to be sensitive, it is difficult to see which positions in the DoD or other executive agencies would not be deemed sensitive.

Finally, while the majority purports to reserve the issue, the rights of these employees under Title VII and the Whistleblower Protection Act will be affected as well, as the Board has made clear that extending *Egan* would "preclude Board and judicial review of alleged unlawful discrimination, whistleblower retaliation, and a whole host of other constitutional and statutory violations." *Conyers*, 115 M.S.P.R. at 585. This is in accord with numerous decisions holding that such claims are precluded where the basis for agency action is the denial of a security clearance.[17]

---

[17] *See El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 184-86 (3d Cir. 2011) (holding that a plaintiff could not prevail on his First Amendment and Fifth Amendment claims where he alleged his security clearance had been revoked in retaliation for constitutionally protected speech or based on his religion or national origin); *Bennett v. Chertoff*, 425 F.3d 999, 1003 (D.C. Cir. 2005) ("While [the plaintiff] claims that [the agency's] security clearance

I respectfully dissent.

---

explanation is pretextual, . . . a court cannot adjudicate the credibility of that claim."); *Hesse v. Dep't of State*, 217 F.3d 1372, 1377-80 (Fed. Cir. 2000) (holding that the MSPB lacks jurisdiction where a petitioner alleges that his security clearance had been revoked in retaliation for whistleblowing); *Perez v. FBI*, 71 F.3d 513, 514-15 (5th Cir. 1995) ("Because the court would have to examine the legitimacy and the possibly pretextual nature of the [agency's] proffered reasons for revoking the employee's security clearance, any Title VII challenge to the revocation would of necessity require some judicial scrutiny of the merits of the revocation decision." (footnote omitted)); *Brazil v. U.S. Dep't of the Navy*, 66 F.3d 193, 196 (9th Cir. 1995) (noting that "a Title VII analysis necessarily requires the court to perform some review of the merits of the security clearance decision").